UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ELIESER LUMPUY d/b/a
3LM Motorsports,

    Plaintiff,

v.                                                 Case No. 8:11-cv-2455-T-24 MAP

SCOTTSDALE INSURANCE
COMPANY,

    Defendant.
_____/

**ORDER**

This cause comes before the Court on cross-motions for summary judgment (Doc. No. 28, 41), which are opposed (Doc. No. 38, 53). As explained below, the motions are denied.

**I. Background**

Plaintiff Elieser Lumpuy owns commercial property that was insured by Defendant Scottsdale Insurance Company from July 25, 2009 through July 25, 2010. (Doc. No. 38-1). The policy provided $150,000 in sinkhole coverage and stated the following:

> Coverage for Sinkhole Loss includes stabilization of the building (including land stabilization) and repair to the foundation provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and in consultation with you. The professional engineer must be selected or approved by us. However, until you enter into a contract for performance of building stabilization or foundation repair:
>
> 1.   We will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and
> 2.   Our payment for Sinkhole Loss to Covered Property may be limited to the actual cash value of the loss to such property.

> After you have entered into a contract for performance of building stabilization or foundation repair, we will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred. If repair has begun and the aforementioned professional engineer determines that the repairs will exceed the applicable Limit of Insurance, we will pay only the remaining portion of the applicable Limit of Insurance upon such determination. The most we will pay for the total of all Sinkhole Loss, including building and land stabilization and foundation repair, is the applicable Limit of Insurance on the affected building.

(Doc. No. 49-1, p. 46).

On December 15, 2009, Plaintiff discovered sinkhole damage to his property, and he filed a claim under Defendant's insurance policy. (Doc. No. 38-1). In response, Defendant hired BCI Engineers & Scientists, Inc. ("BCI") to investigate the damage. (Doc. No. 28-1). On July 13, 2010, BCI issued a report, in which it concluded that sinkhole activity caused damage to Plaintiff's property, and BCI recommended compaction and chemical grouting to mitigate the effects of the sinkhole activity. (Doc. No. 28-1).

On September 13, 2010, Defendant wrote to Plaintiff and advised him that his sinkhole claim was covered under the policy. (Doc. No. 28-1, Ex. B). Defendant also stated in the letter that according to the insurance policy, Defendant would pay to stabilize the land and building and to repair the foundation if and when Plaintiff entered into a contract for such services. (Doc. No. 28-1, Ex. B). Finally, Defendant enclosed a check for $4,847.38 for the actual cash value of sinkhole damage due to the cracks in the building. (Doc. No. 28-1, Ex. B).

In 2010, Plaintiff performed cosmetic repairs to the building (painting and sealing cracks in the walls). (Doc. No. 46, p. 27-30). Plaintiff also obtained an estimate from Triad Consulting Group ("Triad") on May 6, 2011 regarding the cost of additional cosmetic repairs that would be necessary after the subsurface repairs had been done. (Doc. No. 38-8). Triad estimated that the

2

cost of the additional cosmetic repairs would be $24,705.38. (Doc. No. 38-8).

In 2011, Plaintiff retained his own engineer, Florida Testing and Environmental, Inc. ("FTE"), to conduct a peer review of BCI's report and recommendation. (Doc. No. 42-7). On May 4, 2011, FTE issued a report, in which it concluded that fifty-one full perimeter underpins were needed in addition to compaction and chemical grouting to mitigate the effects of the sinkhole activity. (Doc. No. 42-7).

On June 2, 2011, Plaintiff wrote a letter to Defendant, in which he notified Defendant that he was entering into a contract with Champion Foundation Repair System ("Champion") to stabilize the land and building and to repair the foundation in accordance with FTE's recommendations. (Doc. No. 42-7). Plaintiff enclosed a copy of Champion's Installation Proposal and Work Authorization. (Doc. No. 42-7). Champion estimated that the repairs would cost between $264,025 and $273,485, with payments due as follows: 30% due up front, 30% due upon the repairs being 50% completed, 30% due when the foundation stabilization was completed, and the remaining 10% due when all of the repairs were completed. (Doc. No. 42-7). Both Plaintiff and Champion signed the Installation Proposal and Work Authorization, which stated, in pertinent part:

> In accordance with pages 1-16 of the above referenced proposal and its attached conditions, this page shall represent the acceptance and agreement of all Terms and Conditions and Scope of Work descriptions contained herein. This page and referenced proposal shall represent the only contract and/or agreement for this work and shall supersede any prior representations either express or implied.
> \* \* \*
> We, the undersigned, hereby agree and authorize Champion Foundation Repair to commence the work of sinkhole stabilization on the above referenced residence.
> \* \* \*
> This repair contract is subject to the insurance carrier's

    approval/authorization[.]

(Doc. No. 42-7). One of the terms and conditions contained in Champion's Installation Proposal and Work Authorization was that the proposal was only guaranteed for thirty days. (Doc. No. 42-7). In his June 2, 2011 letter to Defendant, Plaintiff asked that Defendant authorize the repairs, execute Champion's Installation Proposal and Work Authorization, and forward the 30% payment that was due before the repairs could be started. (Doc. No. 42-7).

  On September 1, 2011, instead of approving Champion's Installation Proposal and Work Authorization, Defendant invoked the neutral evaluation provision within the insurance policy. (Doc. No. 28-1). The insurance policy provided that either Plaintiff or Defendant could request a neutral evaluation and that the recommendation of the neutral evaluator would not be binding on either of them. (Doc. No. 49-1).

  However, prior to the occurrence of the neutral evaluation, Plaintiff filed the instant lawsuit in state court on September 13, 2011. Defendant removed the case to this Court on October 28, 2011 and moved to stay the case pending the neutral evaluation. (Doc. No. 3). The Court granted Defendant's motion and stayed the case. (Doc. No. 12).

  Thomas Miller was the neutral evaluator assigned by the Department of Financial Services to evaluate the appropriate method of repair to stabilize the sinkhole conditions on Plaintiff's property. (Doc. No. 28-1). On April 4, 2012, Miller issued his Neutral Evaluation Report, in which he agreed that compaction and chemical grouting were necessary, and additionally, he recommended that six underpins be installed to address certain masonry cracking. (Doc. No. 28-1, Ex. C). Miller estimated that the cost to make these repairs (which excluded cosmetic repairs) would total $153,550. (Doc. No. 28-1, Ex. C).

On April 11, 2012, Plaintiff moved this Court to return this case to active status, as the neutral evaluation was complete. (Doc. No. 13). The Court granted the motion the next day. (Doc. No. 14).

Thereafter, on July 19, 2012, Defendant wrote to Plaintiff, informing him that Defendant had adopted the subsurface repair recommendations of Miller. (Doc. No. 28-1, Ex. D). However, Defendant reminded Plaintiff that pursuant to the language of the insurance policy, Defendant would not pay for such repairs unless and until Plaintiff provided Defendant with a contract to perform such repairs. (Doc. No. 28-1, Ex. D).

On December 17, 2012, Plaintiff moved to supplement his complaint, and the Court granted the motion and directed Plaintiff to file an amended complaint. In his amended complaint, Plaintiff asserts a breach of contract claim based on two things: (1) Defendant's failure to tender the policy limits, even after the neutral evaluator estimated the repair costs to exceed the $150,000 policy limit; and (2) Defendant's failure to approve Champion's Installation Proposal and Work Authorization. Currently pending before the Court are cross-motions for summary judgment.

## II.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

### III. Defendant's Motion for Summary Judgment

Defendant argues that the insurance policy requires three things before its duty to pay for subsurface repairs for sinkhole damage is triggered: (1) Plaintiff must enter into a contract to complete the subsurface repairs; (2) the repairs set forth in the contract must be based on the recommendations of an engineer selected or approved by Defendant; and (3) such repairs must have begun. As such, Defendant argues that it is entitled to summary judgment, because Plaintiff has not entered into a contract to complete the subsurface repairs in accordance with the recommendations of an engineer selected or approved by Defendant and because no such repairs have begun.[1] Therefore, Defendant argues that because Defendant's duty to pay has not yet been triggered, there can be no breach by Defendant at this time. As explained below, the Court concludes that genuine issues of material fact exist that preclude summary judgment for Defendant.

---

[1] Defendant also spends a portion of its motion discussing Chapter 627 of the Florida Statutes. However, it is unclear why Defendant is making any arguments based on Chapter 627, because in the beginning of this litigation, Defendant filed a motion to strike all of the references to Chapter 627 in Plaintiff's original complaint. Defendant moved to strike such references, contending that since it is a surplus lines carrier, Florida Statute § 626.913 makes Chapter 627 of the Florida Statutes inapplicable to it. The Court granted Defendant's motion, stating that because Defendant had shown that it is a surplus lines carrier, Chapter 627 of the Florida Statutes is inapplicable to Defendant pursuant to Florida Statute § 626.913. Therefore, the Court has not considered, and will not further address, Defendant's arguments in its motion for summary judgment relating to Chapter 627.

Plaintiff has submitted evidence that he had executed a subsurface repair contract with Champion (based on FTE's repair recommendation), which was contingent on Defendant's approval. (Doc. No. 47). Defendant appears to argue that because the Champion contract did not specify repairs in accordance with BCI's or Miller's recommendations, Defendant did not have to approve the Champion contract. Therefore, Defendant argues that Plaintiff failed to comply with the policy's requirement that Plaintiff enter into a subsurface repair contract, and as such, its duty to pay has not been triggered.

Plaintiff responds by taking issue with Defendant's failure to approve the Champion contract and pointing out that all contracts (including insurance policies) contain an implied duty to act in good faith. As such, Plaintiff argues that there is a jury question regarding whether Defendant acted in good faith by failing to approve the Champion contract.

The implied duty of good faith has been explained as follows:

> Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations. Parties to a contract raise the implied covenant of good faith and fair dealing when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards. Where there are no standards for exercising discretion, the implied covenant of good faith protects contracting parties' reasonable commercial expectations. [W]here the terms of the contract afford a party substantial discretion to promote the part's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

Kunzelmann v. Wells Fargo Bank, N.A., 2012 WL 2003337, at *5 (S.D. Fla. June 4, 2012)(internal citations and quotation marks omitted). In this case, Defendant chose to accept Miller's repair recommendation over FTE's repair recommendation, and as such, Defendant has

not approved the Champion repair contract (which is based on FTE's repair recommendation). Plaintiff has submitted evidence to the Court that FTE's repair recommendation was superior to Miller's repair recommendation (Doc. No. 38-3). Therefore, the issue of whether FTE's repair recommendation was superior to Miller's repair recommendation is a question of fact for the jury to decide. Additionally, the issues of whether Defendant acted in good faith in failing to approve of FTE as the engineer, as well as whether Defendant acted in good faith in failing to approve the Champion contract based on FTE's repair recommendation, are questions of fact for the jury to decide.

Defendant also argues that it is entitled to summary judgment because the subsurface repairs have not yet begun. However, Defendant did not approve the Champion contract for subsurface repairs, and the Champion contract was contingent on Defendant's approval. Therefore, the fact that the subsurface repairs have not yet begun is not necessarily a bar to Plaintiff's claim.[2]

Accordingly, for the reasons set forth above, the Court rejects Defendant's arguments. As such, Defendant's motion for summary judgment is denied.

## IV. Plaintiff's Motion for Summary Judgment

Plaintiff also moves for summary judgment, relying primarily on the following policy language: "If repair has begun and the aforementioned professional engineer determines that the

---

[2]If Defendant had approved the Champion contract, Champion would have required a payment of 30% of the repair costs up front before the work began, which arguably would have been payable under the insurance policy despite the fact that the work had not yet begun. This conclusion is based on the following language in the insurance policy: "After you have entered into a contract for performance of building stabilization or foundation repair, *we will pay the amounts necessary to begin* and perform *such repairs* as the work is performed and the expenses are incurred." (Doc. No. 49-1, p. 46)(emphasis added).

8

repairs will exceed the applicable Limit of Insurance, we will pay only the remaining portion of the applicable Limit of Insurance upon such determination." (Doc. No. 49-1, p. 46). Based on that language, Plaintiff argues that because he has done cosmetic repairs to the building to fix some of the damage caused by the sinkhole activity, and because Miller has concluded that the subsurface repairs will exceed the policy limit, Defendant has breached the insurance policy by not tendering the remaining policy limit to him.

Alternatively, Plaintiff argues that if the Court disagrees with his interpretation of the policy language cited above, then he would be forced to enter into a subsurface repair contract that exceeds the policy limit (making him personally liable for the excess), which he deems to be unconscionable. As such, Plaintiff argues that if the policy requires him to enter into such a repair contract, he should be able to avoid such a requirement on the basis of unconscionability.

### A.  Cosmetic Repairs and Miller's Repair Cost Estimate

Plaintiff argues that because he has done cosmetic repairs to the building to fix some of the damage caused by the sinkhole activity, and because Miller has concluded that the subsurface repairs will exceed the policy limit, Defendant has breached the insurance policy by not tendering the remaining policy limit to him. Plaintiff cites the following sentence in the policy to support this argument: "If *repair* has begun and the aforementioned professional engineer determines that the repairs will exceed the applicable Limit of Insurance, we will pay only the remaining portion of the applicable Limit of Insurance upon such determination." (Doc. No. 49-1, p. 46)(emphasis added). The thrust of Plaintiff's argument is that because the policy only requires that "repairs" must have begun and does not specify the type of repairs, his cosmetic repairs, in combination with Miller's conclusion that subsurface repairs will exceed the

9

policy limit, triggers Defendant's duty to pay. However, Plaintiff's interpretation of the policy's language is flawed.

Insurance policies are contracts and ordinary contract principles govern their interpretations. See Pacific Employers Ins. Co. v. Wausau Business Ins. Co., 508 F. Supp.2d 1167, 1175 (M.D. Fla. 2007). As explained by this Court:

> [T]he interpretation of an insurance contract is a question of law to be determined by the court. Determining whether an insurance provision is ambiguous is a question of law for the Court. It is well-established in Florida that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer. Therefore, if there is an ambiguity in an insurance policy, that ambiguity should be construed against the insurer.
>
> Policy language is considered ambiguous if the language is susceptible to more than one reasonable interpretation. The courts have, however, cautioned that the fact that a word or phrase is undefined in an insurance policy does not necessarily render that term or phrase ambiguous and in need of interpretation by the court. In arriving at a reasonable interpretation, the terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced, or unrealistic construction. Moreover, when a policy provision remains undefined, common everyday usage determines its meaning.
>
> In general, coverage clauses in insurance policies are interpreted in the broadest possible manner to effect the greatest amount of coverage.

Id. (internal citations and quotation marks omitted).

When the sentence at issue is read in context (by reading the entire policy provision and not just the one sentence in isolation), it is clear that the term "repair" refers to building stabilization and/or foundation repair. The policy provision states:

10

> Coverage for Sinkhole Loss includes stabilization of the building (including land stabilization) and repair to the foundation provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and in consultation with you. The professional engineer must be selected or approved by us. However, until you enter into a contract for performance of building stabilization or foundation repair:
>
> 1. We will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and
> 2. Our payment for Sinkhole Loss to Covered Property may be limited to the actual cash value of the loss to such property.
>
> After you have entered into a contract for performance of building stabilization or foundation repair, we will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred. ***If repair has begun and the aforementioned professional engineer determines that the repairs will exceed the applicable Limit of Insurance, we will pay only the remaining portion of the applicable Limit of Insurance upon such determination.*** The most we will pay for the total of all Sinkhole Loss, including building and land stabilization and foundation repair, is the applicable Limit of Insurance on the affected building.

(Doc. No. 49-1, p. 46)(emphasis added). While the one sentence at issue does not specify "building stabilization and/or foundation" repairs, when read in context, it is clear that the term "repair" in that sentence refers to building stabilization and/or foundation repair, because the repairs referred to throughout this policy provision are building stabilization and/or foundation repairs. See JJD Associates of Palm Beach, Ltd. v. American Empire Surplus Lines Ins. Co., 2011 WL 5873061, at *2 (S.D. Fla. Nov. 22, 2011)(reading insurance policy as a whole to determine the definition of the term "building").

Plaintiff argues that if the Court disagrees with his interpretation of the term "repairs," then the term is ambiguous and must be interpreted in his favor. The Court rejects this argument.

11

"A true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. It is the duty of the trial court to prevent such interpretations." American Medical Intern., Inc. v. Scheller, 462 So. 2d 1, 7 (Fla. 4th DCA1984).

As explained above, the Court rejects Plaintiff's argument that a reasonable interpretation of the term "repairs" in the sentence at issue encompasses cosmetic repairs. As such, the Court denies Plaintiff's motion for summary judgment on this issue.

### B. Unconscionability

Next, Plaintiff argues that if the Court disagrees with his interpretation of the policy language cited above, then he would be forced to enter into a subsurface repair contract that exceeds the policy limits (making him personally liable for the excess), which he deems to be unconscionable. As such, Plaintiff argues that if the policy requires him to enter into such a repair contract, he should be able to avoid such a requirement on the basis of unconscionability.

Unconscionability has been described as the absence of meaningful choice by one party to a contract, along with contractual terms that are unreasonably favorable to the other party to the contract. See Gainesville Health Care Center, Inc. v. Weston, 857 So. 2d 278, 284 (Fla. 1st DCA 2003)(citations omitted). The court in Steinhardt v. Rudolph explained the unconscionability analysis as follows:

> The law in Florida is clear that an unconscionable contract or an unconscionable term therein will not be enforced by a court of equity. . . . [I]f a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result. . . . [M]ost courts take a 'balancing approach' to the unconscionability question, and to tip the

> scales in favor of unconscionability, most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability. Procedural unconscionability focuses on those factors surrounding the entering of the contract which add up to an absence of meaningful choice on the part of one of the parties to the contract as to the terms therein; substantive unconscionability, on the other hand, focuses directly on those terms of the contract itself which amount to an outrageous degree of unfairness to the same contracting party.
>
> \* \* \*
>
> [T]his does not mean, however, that a court will relieve a party of his obligations under a contract because he has made a bad bargain containing contractual terms which are unreasonable or impose an onerous hardship on him. Indeed, the entire law of contracts, as well as the commercial value of contractual arrangements, would be substantially undermined if parties could back out of their contractual undertakings on that basis. . . . It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

Steinhardt v. Rudolph, 422 So. 2d 884, 889-90 (Fla. 3d DCA 1982)(internal citations and quotation marks omitted). Applying the concept of unconscionability should be done with great caution. See Weston, 857 So. 2d at 284 (citing Steinhardt, 422 So. 2d at 890).

Plaintiff argues that the insurance policy's requirement that he enter into a subsurface repair contract before he can collect the policy proceeds for such subsurface damage is unconscionable. Specifically, he argues that he would be forced to enter into a subsurface repair contract that exceeds the remaining $145,152.62 policy limit[3] (because Miller estimated that subsurface repairs would cost approximately $153,550), which would make him personally liable for the excess (which totals $8,397.38).

---

[3]Defendant already paid Plaintiff $4,847.38 for the actual cash value of sinkhole damage due to the cracks in the building, leaving a remaining available policy limit of $145,152.62.

13

Upon consideration, even if the Court accepts Plaintiff's argument that the provision at issue is procedurally unconscionable (because Plaintiff could not negotiate different terms within the insurance policy), the Court concludes that the provision at issue is not substantively unconscionable. "To determine whether a contract is substantively unconscionable, a court must look to the terms of the contract, itself, and determine whether they are so 'outrageously unfair' as to 'shock the judicial conscience.'" Weston, 857 So. 2d at 284-85 (citations omitted). Requiring Plaintiff to enter into a subsurface repair contract (even one that exceeds the available policy limit) before he can collect the policy proceeds for such subsurface damage is not outrageously unfair, nor does it shock the judicial conscience. Instead, as previously stated, a court will not relieve a party of his obligations under a contract simply because the contract imposes a hardship on him. See Steinhardt, 422 So. 2d at 890. Accordingly, the Court denies Plaintiff's motion for summary judgment on the issue of unconscionability.

**V. Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that:

(1)   Defendant's Motion for Summary Judgment (Doc. No. 28) is **DENIED**.

(2)   Plaintiff's Motion for Summary Judgment (Doc. No. 41) is **DENIED**.

(3)   Plaintiff's Motion for Leave to File a Reply (Doc. No. 54) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 8th day of February, 2013.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record